IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA


| | |
|---|---|
| TYRONE JEROME MAZYCK, | CIVIL ACTION NO. 9:18-2689-TMC-BM |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| ANDREW M. SAUL,<br>Commissioner of Social Security, | |
| Defendant. | |

The Plaintiff filed the complaint in this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of the Commissioner wherein he was denied a period of disability

benefits. This case was referred to the undersigned for a report and recommendation pursuant to

Local Civil Rule 73.02(B)(2)(a)(D.S.C.).

Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI)[1] on April 11, 2012 (protective filing date), alleging disability beginning November 15,

2007 due to shoulder problems, lower back problems, high blood pressure, pancreatitis, hypertension,

and a stroke. (R.pp. 327, 329, 429, see also R.p. 155). Plaintiff's claims were denied both initially and

upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge (ALJ),

---

[1]Although the definition of disability is the same under both DIB and SSI; Emberlin v. Astrue,
No. 06-4136, 2008 WL 565185, at * 1 n. 3 (D.S.D. Feb. 29, 2008); "[a]n applicant who cannot
establish that [he] was disabled during the insured period for DIB may still receive SSI benefits if [he]
can establish that [he] is disabled and has limited means." Sienkiewicz v. Barnhart, No. 04-1542,
2005 WL 83841, at ** 3 (7th Cir. Jan. 6, 2005). See also Splude v. Apfel, 165 F.3d 85, 87 (1st Cir.
1999)[Discussing the difference between DIB and SSI benefits].



which was held on July 24, 2014. (R.pp. 63-78). The ALJ thereafter issued a partially favorable

decision on March 26, 2015, finding that Plaintiff became disabled on July 24, 2014 but was not

disabled or entitled to disability benefits before that time. (R.pp. 154-166). Plaintiff requested review

of the decision (R.pp. 152, 253-254), and the Appeals Council granted review, vacated the prior

decision,[2] and remanded the case back to the ALJ to consider whether Plaintiff met the special

earning requirements (i.e., whether he had insured status) at the time he was found to be disabled,[3]

to obtain additional evidence concerning Plaintiff's impairments, to reconsider Plaintiff residual

functional capacity (RFC), and to obtain vocational expert (VE) evidence to clarify the effects of the

assessed limitations on Plaintiff's occupational base (R.pp. 177-179).

   The ALJ then held another administrative hearing on June 16, 2016. (R.pp. 43-62).

Thereafter, the ALJ again issued a partially favorable decision, this time finding that Plaintiff did not

become disabled until January 4, 2017, and that he was not disabled before that date. (R.pp. 17-32).

The Appeals Council denied Plaintiff's request for a review this decision, thereby making the June

16, 2016 determination of the ALJ the final decision of the Commissioner. (R.pp. 1-5). Plaintiff then

---

[2]In the March 2015 decision, the ALJ made a finding that Plaintiff was limited to sedentary work as of July 24, 2014,which appears to have been based on the results of a consultative examination by Dr. Jessica Hannah, which did not occur until almost five months later (December 2014), and on reports from Plaintiff to Dr. Hannah about medical treatment for which there was no evidence in the record. (R.pp. 163, 177-178). The Appeals Council specifically noted that the record did not contain evidence of Plaintiff's reported stroke or other records from January 23, 2013 through December 13, 2014, and that the ALJ had not provided an adequate rationale to support an alleged onset date suggesting the severity of Plaintiff's impairments worsened following a stroke in November 2014. (R.p. 178).

[3]Plaintiff's date last insured for DIB benefits was December 31, 2012. (R.p. 19). To qualify for DIB, a claimant must prove that he became disabled prior to the expiration of his insured status. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.131(a); Johnson v. Barnhart, 434 F.3d 650, 655–56 (4th Cir. 2005).



filed this action in United States District Court. Plaintiff asserts that the ALJ's decision is not supported by substantial evidence, and that this case should be remanded for further proceedings. The Commissioner contends that the decision to deny benefits prior to January 4, 2017 is supported by substantial evidence, and that Plaintiff was properly found not to be disabled prior to that time.

### Scope of review

Under 42 U.S.C. § 405(g), the Court's scope of review is limited to (1) whether the Commissioner's decision is supported by substantial evidence, and (2) whether the ultimate conclusions reached by the Commissioner are legally correct under controlling law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Richardson v. Califano, 574 F.2d 802, 803 (4th Cir. 1978); Myers v. Califano, 611 F.2d 980, 982-983 (4th Cir. 1980). If the record contains substantial evidence to support the Commissioner's decision, it is the court's duty to affirm the decision. Substantial evidence has been defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. **If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is "substantial evidence."** [emphasis added].

Hays, 907 F.2d at 1456 (citing Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966)); see also Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008)[Nothing that the substantial evidence standard is even "less demanding than the preponderance of the evidence standard"].

The Court lacks the authority to substitute its own judgment for that of the Commissioner. Laws, 368 F.2d at 642. "[T]he language of [405(g)] precludes a *de novo* judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court



3

disagree with such decision as long as it is supported by 'substantial evidence.'" Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

## Medical Record

On October 25, 2007, Dr. William Estes, an orthopedist at Charleston Bone and Joint, evaluated Plaintiff as part of a Workers' Compensation claim based on complaints of constant, sharp, and non-radiating pain that had lasted one month. An MRI revealed a partial rotator cuff tear, and it was noted that Plaintiff had had four sessions of physical therapy that he reported had helped minimally. Dr. Estes diagnosed a SLAP (superior labrum anterior and posterior) tear and injected Plaintiff's shoulder. (R.pp. 1064-1065). Plaintiff subsequently underwent SLAP repair surgery on December 19, 2007, but continued to complain of shoulder pain thereafter. (R.pp. 1067-1073).

On April 24, 2008, Plaintiff was treated at East Cooper Medical Center (ECMC) for slurred speech that had started four days prior and was intermittent, but had returned that morning. Plaintiff's blood pressure was 201/111, he had right facial weakness, and an ECG showed possible ischemia, but he had no weakness in his lower extremity. A CT scan of the brain revealed a 1.8 centimeter parenchymal hemorrhage within the region of the left subinsular white matter with slight surrounding edema and slight mass effect in the sylvian cortex that looked like a hypertensive hemorrhage. The assessment was hypertensive hemorrhage and hypertensive emergency. (R.pp. 641-647, 706-709, 763).

Plaintiff returned to see Dr. Estes on May 22, 2008 with complaints of continued right shoulder pain. Plaintiff stated that his employer would not let him return to work with light or limited duty. (R.p. 1073). A June 2008 MRI of Plaintiff's right shoulder showed postoperative change



4

consistent with a prior labral repair; mild fraying of the glenoid labrum which might be related to prior postoperative change or nondisplaced tearing; partial tearing of the supraspinatus, infraspinatus, and subcapularis tendon; and prominent sentinel cyst associated with the supraspinatus tendon. (R.pp. 1074-1075). On October 14, 2008, Plaintiff was evaluated at the CARES Clinic (CARES) for a history of high blood pressure and a stroke six months prior. He reported he could no longer afford Norvasc since losing his job, complained of sleep loss due to shoulder pain, and reported he needed to have his blood pressure better controlled before shoulder surgery could be performed. Norvasc and HCTZ were prescribed. (R.pp. 549-550).

Plaintiff underwent right arthroscopic rotator cuff repair, right biceps open tenodesis, and right shoulder labral debridement at ECMC on November 3, 2008. (R.pp. 652-653). He returned to the hospital on November 19, 2008, with complaints that his right foot and leg were not moving correctly. His blood pressure was 181/106 and a CT scan of his head showed extensive bilateral white matter changes in the subcortical white matter of his cerebral hemispheres, indicating progressive white matter ischemic changes, greater on the left. There was no evidence of an acute hemorrhage or mass defect. (R.pp. 769-770, 791).

On January 3, 2009, Dr. Estes continued Plaintiff's work restrictions of "no lifting >10 lbs. No work." (R.pp. 1081-1082). Dr. Estes administered a right shoulder injection on February 13, 2009, and the assessment was "activity as tolerated." (R.pp. 1083-1085). On May 14, 2009, Plaintiff reported that his right shoulder was painful and had "crunching" with movement. His strength was 4/5. (R.pp. 1088-1089). A May 2009 MRI of Plaintiff's right shoulder showed contrast dissected along the undersurface of the infraspinatus to the musculotendinous junction consistent with an unhealed or recurrent partial tear. There was a torn and retracted long head of the biceps, and



widening of the acromioclavicular joint which was felt to be post-operative or due to an old sprain. (R.p. 1093). Dr. Estes assessed Plaintiff on May 29, 2009 with complete rupture of his rotator cuff, planned to see Plaintiff as needed, and stated he would offer an impairment rating. (R.pp. 1090-1091).

Plaintiff was prescribed Metroprolol in addition to HCTZ and Amlodipine at CARES to treat his high blood pressure on July 30, 2009. He admitted to drinking 6-7 beers a day. (R.p. 547). He returned to CARES in December 2009 with elevated blood pressure (he said he had run out of medication). Examination revealed that Plaintiff had mild right shoulder pain with an empty can test. Right rotator cuff inflammation and hypertension were assessed and Plaintiff was directed to take his anti-hypertensive medications and to use NSAIDs for his right shoulder. (R.p. 546). Examination at CARES on January 14, 2010 revealed a positive empty can test, that his biceps tendon was tender to palpation, and he had loss of range of motion. Plaintiff's blood pressure medication was increased, and a referral was made for physical therapy. (R.p. 545).

At his second session of physical therapy on February 9, 2010, Plaintiff inquired about vocational rehabilitation. It was observed that he had a greater range of motion than when asked to perform motion in functional use. The physical therapist assessed chronic shoulder pain with limited rehabilitation potential. (R.p. 551).

On July 14, 2010, Plaintiff was treated at ECMC for complaints of head, neck, and back pain, as well as tingling and pain in both hands after he fell off a ladder. Oxycodone was prescribed for cervical strain. A CT of Plaintiff's head showed diffuse cortical atrophy, chronic small vessel ischemic change in the white matter, and several old lacunar infarcts with findings more advanced than average for his age. CT of his cervical spine showed degenerative disc disease



throughout Plaintiff's cervical spine with moderate diffuse disc bulge at C6-7. The impression was cervical strain. (R.pp. 590-591, 593-594, 730-733).

Plaintiff returned to CARES on December 14, 2010. with complaints of right and left shoulder pain (which had been present for six months), and intermittent sharp chest pain every 30 to 45 minutes that did not cause any issues. On examination, Plaintiff was not able to actively abduct or extend or flex his arms past 90 degrees due to pain, but his range of motion was slightly increased with passive movement. His blood pressure was 196/110. Blood pressure medication and physical therapy were prescribed. (R.pp. 921-922). On January 18, 2011, a physical therapist assessed Plaintiff with severe left shoulder pain and extremely limited function, noted that strength and range of motion could not be tested secondary to pain, and thought Plaintiff would benefit from orthopedic referral and imaging. (R.p. 629).

Plaintiff complained of abdominal pain and lip swelling at ECMC on January 22, 2011. Examination revealed moderate abdominal tenderness in all quadrants with voluntary guarding. A CT of Plaintiff's abdomen and pelvis indicated that the head of Plaintiff's pancreas was enlarged, there was streakiness/fluid/ascites around the head and body of the pancreas, the common bile duct was dilated, and his stomach was distended. The impression was angioedema (due to the ACE inhibitor he was taking) and pancreatitis. Plaintiff's blood pressure medications were adjusted, and he was prescribed Oxycodone and a Medrol Pak. (R.pp. 635-639, 664-665).

Plaintiff was seen at CARES for hypertension and new scaly patches on his hands and feet on September 20, 2011. His blood pressure was 168/103. He was assessed with angina, eczema, and hypertension, and medications were refilled. (R.p. 633). Plaintiff was assessed with pancreatitis and atypical chest pain at ECMC on March 22, 2012. (R.pp. 672-674).



On July 11, 2012, Dr. Thaddeus Bell performed a consultative examination to evaluate Plaintiff's history of shoulder problems, low back problems, pancreatitis, and stroke. Plaintiff reported that he still had weakness and frequent pain in his shoulder despite two surgeries to repair his right rotator cuff. He said that he injured his back on the job and that back pain prevented him from working. Plaintiff's blood pressure was 173/97. He was noted to be blind in his left eye (since birth) although his visual acuity in his right eye was 20/20. Plaintiff had decreased strength in his right shoulder and tenderness on the right side of his upper extremity, but good range of motion. Plaintiff had 3/5 resistence motion in his hands. He used a cane to walk and had an antalgic gait. Dr. Bell diagnosed Plaintiff with a history of hypertension which was not controlled, history of stroke with obvious loss of memory issues, history of alcohol abuse, history of pancreatitis, history of right shoulder pain secondary to rotator cuff injury, and status post surgery to the rotator cuff times two. (R.pp. 927-929). An x-ray of Plaintiff's lumbar spine showed mild degenerative disc disease of his lower thoracic and lumbar spine and mild grade 1 degenerative retrolisthesis of L5 on S1. (R.p. 926).

Dr. Mark McClain performed a consultative psychological examination on September 24, 2012. He noted that Plaintiff walked slowly with a cane in his right hand and appeared to limp, wobble, and lean to the right side with a somewhat unbalanced, but stable gait. Plaintiff reported sleep problems associated with pain issues and mild anxiety associated with health and money problems. Plaintiff obtained a Full Scale IQ score of 70, placing him in the borderline range of intelligence. Testing also revealed that Plaintiff had fourth-grade equivalent word reading and math computation scores and fifth-grade equivalent sentence comprehension scores. (R.pp. 1015-1019).

On October 14, 2012, Plaintiff was treated at ECMC for complaints of shortness of breath with walking in his yard. His blood pressure was 187/92. A chest CT showed mild



cardiomegaly and multiple small nodular hazy opacities throughout the bilateral upper lung lobes which was thought to be an infection rather than metastatic disease. The assessment was atypical chest pain and dyspnea, and he was treated for pneumonia. (R.pp. 942-953).

Plaintiff was treated at CARES on November 20, 2012 for complaints of right hip, shoulder, and back pain that had worsened since a fall seven days prior. He also complained of night sweats, sharp chest pain, diffuse paresthesias, palpations, blurry vision, headache, and shortness of breath at rest. Even though Plaintiff demonstrated an impaired ability to walk due to pain, on examination it was noted that he had 5/5 (full) strength bilaterally. He was assessed with an acute exacerbation of chronic joint pain to be treated with over-the-counter medications and Tramadol. (R.pp. 1028-1029).

Plaintiff began treatment at the Franklin C. Fetter Clinic (Fetter Clinic) on January 23, 2013, at which time it was noted that his blood pressure was 181/193. Plaintiff complained of abdominal tenderness, right shoulder tenderness and severe pain with motion, and that both thumbs had osteoarthritis changes. The assessment was benign hypertension, hyperlipidemia, and general osteoarthrosis. (R.pp. 1059-1061). He continued to be treated at the Fetter Clinic approximately once every three months from April 2013 to October 2014. (R.pp. 1141-1158).

On October 31, 2014, Plaintiff was seen in the ECMC Emergency Room for reports of slurred speech, right-sided weakness, and an inability to ambulate effectively. Discharge diagnoses include small acute CVA at the right posterior frontal lobe and posterior corona radiata, lumbar spinal stenosis, and alcohol abuse. It was noted that Plaintiff was unfunded and it was thought that home care might be donated. He was discharged home with a walker. (R.pp. 1118-1120, 1123-1124).



On November 10, 2014, Plaintiff returned to Dr. Effiong at the Fetter Clinic complaining of problems filling his medications. Dr. Effiong noted that Plaintiff had an unsteady gait and used a walker, although an examination revealed he had full strength, stability, and range of motion in all extremities with no sensory loss, weakness or pain. (R.pp. 1159-1162).

Dr. Jessica Hannah conducted a consultative examination on December 13, 2014. Plaintiff reported he was independent with his activities of daily living. Dr. Hannah noted that Plaintiff used a walker to ambulate, but found on examination that he had no muscle asymmetry, atrophy, or involuntary movements. Examination further revealed that Plaintiff had positive pronator drift in his upper right extremity, but with normal strength; full grip strength, adequate dexterity, adequate fine motor movements, that he was able to grasp objects; had some break away weakness in his right lower extremity during periods of full effort; and negative Romberg (test for motor coordination ataxia), finger-to-nose, heel-to-shin, and rapid alternating movement testing. (R.pp. 1113-1115). Dr. Hannah also completed a medical source statement (physical) in which she opined that Plaintiff could lift and up to ten pounds frequently; could sit for eight hours and stand and walk for four hours at a time; required a four-wheel walker for ambulation; and had postural limitations. She opined that these limitations had lasted or would last for twelve consecutive months. (R.pp. 1105-1110).

Plaintiff was treated by Dr. Effiong at the Fetter Clinic in February, May, September, and December 2015, and in March 2016. Although there was no mention of a walker at appointments in February 2015, September 2015, and March 2016 (R.pp. 1163-1167, 1173-1177, 1184-1188 ), Dr. Effiong noted in May 2015 and December 2015 that Plaintiff's overall appearance included a walker (R.pp. 1170, 1181).



On March 9, 2016, Plaintiff was treated at the ECMC Emergency Room for complaints of right hip and knee pain. It was noted that upon arrival he ambulated without assistance. In a fall risk assessment, it was noted that Plaintiff used an ambulatory aid (crutches, cane, or a walker), had an impaired gait, and had had a fall within the previous twelve months such that his fall risk was high. Plaintiff was discharged with pain medication, and it was noted that he was "[d]ischarged to home ambulatory, with walker". (R.pp. 1131-1137).

On March 17, 2016, Plaintiff was examined by Dr. Brodie McKoy, an orthopedist with Southern Orthopedics, for pain, decreased range of motion, instability, and weakness on the right side. Knee x-rays were noted to be normal, but x-rays of his hip showed a cam lesion with 60 degree alpha angle. Dr. McKoy made no notations concerning a walker. The plan was for Plaintiff to begin home physical therapy for strengthening and to continue using a knee brace. (R.pp. 1198-1201).

Dr. William Maguire performed a consultative examination on March 13, 2017. He noted that Plaintiff denied any numbness or weakness in his legs or arms, but walked slowly with a walker and a knee brace. Although examination revealed normal strength and sensation in Plaintiff's extremities, symmetrical reflexes, and intact cerebral functioning, Dr. Maguire stated that Plaintiff "appear[ed] to be completely disabled as he is currently on disability." (R.pp. 1207-1210). He also completed a medical source statement (physical) in which he opined that Plaintiff could not lift/carry any weight, could sit for seven hours in an eight-hour day, and could stand/walk for one hour in an eight-hour day. Dr. Maguire noted that Plaintiff used a walker and thought that Plaintiff could not ambulate without using a wheelchair, walker, two canes, or crutches. (R.pp. 1217-1222).



## **Discussion**

A review of the record shows that Plaintiff, who was forty-five years old on his alleged onset of disability date and fifty-five years old on January 4, 2017 (the date the ALJ found that he was disabled), has a high school education and past relevant work experience as a metal fabricator. (R.pp. 46, 56-57, 323, 430). In order to be considered "disabled" within the meaning of the Social Security Act, Plaintiff must show that he has an impairment or combination of impairments which prevent him from engaging in all substantial gainful activity for which he is qualified by his age, education, experience, and functional capacity, and which has lasted or could reasonably be expected to last for a continuous period of not less than twelve (12) months. After consideration of the evidence and testimony in the case the ALJ determined that, although Plaintiff does suffer from the "severe" impairments[4] of left eye blindness, acute cerebrovascular accident (CVA)/stroke, status post right rotator cuff repair, and borderline intellectual functioning (R.pp. 19-20), he nevertheless retained the RFC to perform light work[5] through January 4, 2017 with limitations to occasional climbing, stooping, and balancing; occasional performance of right overhead reaching; no performance of work that requires driving; avoidance of work at heights or around moving machinery; a limitation to understanding, remembering, and carrying out simple instructions; and the use of a single point cane for ambulation (R.p. 23). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work with these limitations. (R.p. 30). The ALJ then obtained testimony from a VE

---

[4]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See Bowen v. Yuckert, 482 U.S. 137, 140–142 (1987).

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).



and found at step five that Plaintiff could perform other jobs existing in significant numbers in the national economy with these limitations through January 4, 2017, and thus was not disabled prior to that time. (R.pp. 30-32). However, the ALJ also determined that, based on Plaintiff's change of age category to advanced age (55) and pursuant to the Medical-Vocational Guidelines,[6] Plaintiff became disabled as of January 4, 2017. (R.pp. 31-32).

Plaintiff asserts that the ALJ's RFC assessment is not supported by substantial evidence. Specifically, Plaintiff contends that the Commissioner erred in finding that he has the RFC to perform light work and failed to adequately explain, pursuant to SSR 96-8p, how the assigned RFC is consistent with the medical and other evidence. In particular, he argues that the RFC is not supported by the evidence of his inability to perform the standing and walking required in light work given his need for a walker.[7] Plaintiff also objects to the ALJ's evaluation of Plaintiff's subjective need for a walker, arguing that the ALJ failed to reconcile conflicting evidence and failed to discuss any factors outside of the objective documented evidence. However, after careful review and consideration of the evidence and arguments presented, the undersigned finds and concludes for the reasons set forth hereinbelow that there is substantial evidence to support the decision of the Commissioner, and that the decision should therefore be affirmed. Laws, 368 F.2d 640 [Substantial

---

[6]The Medical-Vocational Guidelines (i.e., the "Grids"), are matrices of the 'four factors identified by Congress -- physical ability, age, education, and work experience -- and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.'" Daniels v. Apfel, 154 F.3d 1129, 1132 (10th Cir. 1998) (quoting Heckler v. Campbell, 461 U.S. 458, 461-462 (1983)). "Through the Grids, the Secretary has taken administrative notice of the number of jobs that exist in the national economy at the various functional levels (i.e., sedentary, light, medium, heavy, and very heavy.)" Daniels, 154 F.3d at 1132.

[7]The VE testified that Plaintiff could perform the jobs identified if Plaintiff needed to use a single-point cane, but there would be no work at the light unskilled level if Plaintiff required a walker to ambulate. (R.pp. 59-60).



evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion"].

RFC is defined as "the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). In SSR 96-8p, RFC is defined as a function-by-function assessment of an individual's physical and mental capacities to do sustained, work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours per day, five days per week, or the equivalent. SSR 96-8p, 1996 WL 374184. An RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Id. at *7. Here, the ALJ properly evaluated Plaintiff's RFC by considering all of the evidence and including in his decision a narrative discussion of the medical and nonmedical evidence, including treatment notes and results of objective tests (including x-rays, CT scans, and MRI) leading to his conclusion that Plaintiff had the RFC to perform a limited range of light work. (R.pp. 23-30). See Knox v. Astrue, 327 F. App'x 652, 657 (7th Cir. 2009) ["[T]he expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient"], citing Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005); Osgar v. Barnhart, No. 02–2552, 2004 WL 3751471, at *5 (D.S.C. Mar. 29, 2004). In doing so, the ALJ specifically explained why he did not credit the contradictory evidence in the record, including opinion evidence. Lyall v. Chater, No. 94-2395, 1995 WL 417654, at * 1 (4th Cir. 1995)[Finding no error where the ALJ's analysis "was sufficiently comprehensive as to permit appellate review"].

For example, the ALJ specifically considered Plaintiff's left eye blindness, but noted that Plaintiff had uncorrected 20/25 vision in his right eye and that Plaintiff admitted he had been



blind in his left eye for many years, including while working as a metal fabricator. Even so, based on Plaintiff's left eye blindness in combination with his other impairments, the ALJ determined that Plaintiff was unable to perform work that required driving and that he should avoid work at heights or around moving machinery. (R.p. 24). As for Plaintiff's shoulder complaints, the ALJ considered Plaintiff's testimony concerning shoulder pain and his medical history, including his surgeries, in determining that Plaintiff was limited to occasional overhead reaching with his dominant right upper extremity and that this contributed to a restriction to lifting and carrying consistent with only light work. (R.pp. 25-26, see also R.pp. 23-24, 29). The ALJ also considered Plaintiff's testimony as to right-sided pain and weakness as well as his medical treatment for strokes in determining that the record did not support a determination that the use of a walker was medically necessary, instead finding that Plaintiff was capable of performing work at the light exertional level which allowed him to ambulate with the use of a single point cane. (R.p. 28, see also R.pp. 26-27). Finally, the ALJ found that although Plaintiff had borderline intellectual functioning, examinations revealed that he had good attention, concentration, and memory, such that there were no mental limitations beyond that contemplated by unskilled work. (R.p. 29). These findings are supported by substantial evidence in the case record. Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is 'substantial evidence'].

As for Plaintiff's complaints about the ALJ's consideration of the opinion evidence, the ALJ explained that although he gave some weight to some of Dr. Hannah's conclusions, he gave her opinion little weight as to the opined abnormalities in ambulation and the need for a walker because during Plaintiff's November 2014 hospitalization the neurologist noted only mild abnormalities that did not support such a conclusion while the MRI findings were inconsistent with



15

Plaintiff's complaint of right-sided weakness. The ALJ also found that Dr. Hannah's conclusions were inconsistent with her own examination findings that Plaintiff had 5/5 (full) grip strength with adequate fine motor movements, dexterity, and the ability to grasp objects bilaterally, and that his arthropathy did not affect his strength. (R.p. 27). See Burch v. Apfel, 9 F. App'x 255 (4th Cir. 2001)[ALJ did not err in giving physician's opinion little weight where the physician's opinion was not consistent with her own progress notes.]. The ALJ also adequately explained his decision to give Dr. Maguire's opinion little weight, including that it was based on a one-time encounter, the assessed limitations appeared to be largely based on Plaintiff's subjective reports of symptoms, and that the limitations found by Dr. Maguire were inconsistent with the relatively mild clinical findings documented in the longitudinal treatment record. (R.pp. 28-29). See Johnson v. Barnhart, 434 F.3d 650, 657 (4th Cir. 2005) [ALJ properly rejected physician's opinion that was based on the claimant's own subjective complaints]; cf. Craig v. Chater, 76 F.3d 589-590 (4th Cir. 1996)["There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain'"]; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) [ALJ may assign lesser weight to the opinion of a treating physician that was based largely upon a claimant's self-reported symptoms]; see also Smith v. Chater, 99 F.3d at 635,638 (4th Cir. 1996) ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"].

The ALJ's RFC determination is further supported by the state agency medical consultants' assessments, which the ALJ gave partial weight. (R.p. 29). See Johnson v. Barnhardt, 434 F.3d 650, 657 (4th Cir. 2005)[ALJ can give significant weight to opinion of medical expert who has thoroughly reviewed the record]; see also Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014) [noting that opinions from state agency consultants may be entitled to even greater weight than the



opinions of treating or examining sources].  State agency physician Dr. Jim Liao opined in October

2012, and state agency physician Dr. Mary Lang opined in February 2013, that Plaintiff could

perform a range of light work largely consistent with the assigned RFC.  (R.pp. 93-95, 123-126).

However, It is readily apparent that the ALJ gave Plaintiff every benefit of the doubt in determining

his RFC, as he found that additional limitations were warranted over and above those assigned by the

state agency physicians in light of the overall evidence.  (R.p. 29).  See Marquez v. Astrue, No.

08–206, 2009 WL 3063106, at *4 (C.D.Cal. Sept. 21, 2006)[No error where ALJ's RFC finding was

even more restrictive than the exertional levels suggested by the State Agency examiner]; see also

Siler v. Colvin, No. 11-303, 2014 WL 4160009, at * 5 (M.D.N.C. Aug. 19, 2014) [same]; cf. Muir

v. Astrue, No. 07-727, 2009 WL 799459, at * 6 (M.D.Fla. Mar. 24, 2009)[No error where ALJ gave

Plaintiff even a more restrictive RFC than the medical records provided]. The ALJ specifically found

that Plaintiff was more limited in terms of overhead reaching and as to his right upper extremity

based on his history of arthroscopic surgery. (R.p. 29). Additionally, the ALJ found that Plaintiff

required the use of a single-point cane for ambulation. (R.p. 27).  Even so, the ALJ also noted that

he did not include the state agency consultants' restrictions to frequent pushing and pulling, noting

Plaintiff's lack of upper extremity complaints and findings during the past several years, and did not

include restrictions to frequent kneeling, crouching, crawling, and the use of his right upper extremity

for handling, as there were no ongoing objective findings in the treatment record to support such

restrictions. (R.pp. 29-30).

       Plaintiff argues that the ALJ committed reversible error by failing to include in the

RFC finding that Plaintiff needed to use a walker. Plaintiff specifically asserts that the ALJ erred in

making the finding that "a careful review of the treatment record fails to document clinical findings



of significant gait abnormality or weakness that would support a determination that the use of a walker is medically necessary" (R.p. 28). Plaintiff argues that the ALJ incorrectly stated that the orthopedic notes from 2016 did not indicate that Plaintiff was using a walker, and incorrectly stated that Plaintiff was ambulating without assistance upon arrival at the emergency room in March 2016. See Plaintiff's Brief, ECF No. 14 at 11-12. He also argues that the opinions of the consultative physicians (Dr. Hannah and Dr. Maguire) support his need for a walker, and in particular that Dr. Hannah's opinion (given approximately a month after his November 2014 hospital discharge) supports a finding that a rolling walker was not a temporary measure. However, as noted by the ALJ, there is no documentation that any of Plaintiff's treating physicians advised him to continue to use a walker or any assistive device. (R.p. 27). Although Dr. Effiong recommended a knee brace, he never recommended continued use of a walker. (R.pp. 27, 1166). The ALJ also noted that Plaintiff did not follow up with the Fetter Clinic for a year, from June 2013 until June 2014, and when he did he presented using a cane (not a walker), and that while he presented with a walker in November 2014 for hospital follow up and an unsteady gait was noted, a physical examination revealed no sensory loss, weakness, or pain. (R.p. 26). Moreover, although there was a notation that at the November 2014 hospital discharge Plaintiff had a rolling walker, there is no mention in the medical record that a walker was intended long-term, as opposed to during the recovery period after his stroke. The ALJ also noted that during Plaintiff's March 2016 emergency room visit, he ambulated into the facility without assistance. (R.p. 27-28). Additionally, although, as part of a fall risk assessment it was noted that Plaintiff used an assistive aid, the assessment defined this term as "crutches/cane/walker" (R.p. 1131), which does not conflict with the ALJ's finding that Plaintiff needed a cane for ambulation. The ALJ also found that there was no indication Plaintiff used a walker



during his March 2016 appointment with an orthopedist, and although the orthopedist recommended use of a knee brace, there is no indication that the orthopedist found that the use of a walker was medically necessary. (R.p. 28, 1199-1200). Additionally, as discussed above, the ALJ's decision to give the opinions of consultative physicians Drs. Hannah and Maguire little weight, including their findings concerning the use of a walker, are supported by substantial evidence.

Discussing the interplay between sedentary work[8] and hand-held assistive devices, SSR 96–9P provides: "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." SSR 96-9P, 1996 WL 374185, at *7. The Ruling further states that "an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand," and that an individual who uses an assistive device due to the impairment of only one lower extremity may "still have the ability to make an adjustment to sedentary work that exists in significant numbers." Id. The ALJ's findings and analysis comports with these requirements. Additionally, when an assistive device such as a cane is found to be required, the Ruling provides that "it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." Id. Here, the ALJ specifically incorporated Plaintiff's need to use a single point cane

---

[8]SSR 96-9p explains the impact of an assistive device on an RFC for sedentary work, rather than the light work at issue here. However, courts within this circuit have applied this ruling to light work also, since it involves greater lifting than sedentary work. See Timmons v. Colvin, No. 3:12CV609, 2013 WL 4775131, at *8 (W.D.N.C. Sept. 5, 2013)[noting that courts have applied SSR 96-9p to light work as it involves greater lifting than sedentary and because "a plaintiff always bears the burden of proving her RFC, and therefore the standards in SSR 96-9p can be useful in determining if a plaintiff met that burden."] .



19

for ambulation in his hypothetical to the VE, who in turn found that Plaintiff could perform the work assigned with this limitation. See Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980)[ALJ may rely on VE opinion based on training, experience and familiarity with skills necessary to function in various jobs].

Plaintiff also contends that the ALJ erred in evaluating his RFC because "[i]informing the ALJ's RFC analysis was his acceptance or rejection of the claimant's subjective complaints." ECF No. 14 at 13. An ALJ is to evaluate a claimant's subjective symptoms using a two-part test. Craig v. Chater, 76 F.3d 589, 594 (4th Cir. 1996); 20 C.F.R. § 404.1529 (effective June 13, 2011 to March 26, 2017). First, the ALJ must determine whether objective evidence shows the existence of a medical impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(b). Once the claimant makes that threshold showing, the ALJ must then evaluate the extent to which the symptoms limit the claimant's capacity to work. 20 C.F.R. § 404.1529(c)(1). In doing so, the ALJ should not "evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." SSR 16-3p, 2016 WL 1119029, at *5.[9] Rather, "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ is to "carefully consider any other information" about a claimant's symptoms. 20 C.F.R.

---

[9]SSR 16-3p became effective March 28, 2016 (more than a year before the decision in this case) and supercedes SSR 96-7p. See SSR 16-3p, 2016 WL 1119029, at *1. This new ruling "eliminat[es] the use of the term 'credibility' from ... sub-regulatory policy, as [the] regulations do not use this term." Id.. The ruling "clarif[ies] that subjective symptom evaluation is not an examination of the individual's character," id., and "offer[s] additional guidance to [ALJs] on regulatory implementation problems that have been identified since [the publishing of] SSR 96–7p," id. at *1 n.1. However, while SSR 16-3p eliminates the assessment of credibility, it still requires assessment of most of the same factors to be considered under SSR 96-7p.



§ 404.1529(c)(3). At the second stage, the ALJ should consider all of the available evidence, including the claimant's medical history, objective medical evidence, and statements by the claimant. 20 C.F.R. § 404.1529(c). This requires assessment of all of the available evidence, including the claimant's treatment history; signs and laboratory findings; statements from the claimant; the claimant's treating and non-treating medical sources and other persons; and medical opinions of record. 20 C.F.R. § 404.1529(c)(1). Factors relevant to the claimant's symptoms can include the claimant's activities of daily living; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medications taken to alleviate pain or other symptoms; treatment, other than medication, that claimant receives for relief of pain or other symptoms; any other measures an individual uses to relieve pain or other symptoms; and any factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.

In compliance with this requirement, the ALJ set forth in his decision the two-step process for evaluating subjective complaints. (R.p. 23). He then found that although Plaintiff's medically determinable impairments could reasonably be expected to cause some of Plaintiff's alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and the other evidence of record. (R.p. 24). Plaintiff asserts that the ALJ considered only isolated citations to the record, failed to reconcile conflicting evidence, and failed to discuss any factors outside the objective documented evidence. However, in making his findings, the ALJ specifically discussed Plaintiff's reported activities as found in the function report and as testified to by Plaintiff at the two hearings. (R.pp. 23-



24). He noted Plaintiff's reports that he was able to prepare simple meals and cooked three times a week with help from his wife, do laundry, drive, shop for food and other necessities, and visit family and friends on a regular basis. (R.pp. 24, 70, 438-440). The ALJ also noted that although Plaintiff was prescribed pain medication at the Fetter Clinic, he used it sparingly to help with his musculoskeletal pain. (R.p. 27). There is also no indication, and Plaintiff has not argued, that a walker was necessary (or even used) prior to his date last insured for DIB. Plaintiff may be attempting to argue that the ALJ should have found that a walker was prescribed after his November 2014 stroke. However, at the first hearing in July 2014, Plaintiff testified that he used a walker, although at the hearing he was noted to have a cane (R.pp. 24, 69, 73), while at the second hearing, he first stated that he walked with a cane, but later stated that he was told by the hospital (in November 2014) to get a walker and that he had used a walker since the stroke. (R.pp. 54-55).

In evaluating this testimony, the ALJ considered inconsistencies in the record, including that after 2016 Plaintiff generally appeared at medical appointments without using an assistive device and denied difficulty walking at one appointment. (R.pp. 1130, 1186, 1198-199). As noted above, the ALJ also found that Plaintiff's complaints of right-sided weakness after his 2014 stroke was inconsistent with MRI findings. (R.p. 27). See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) [ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating a plaintiff's subjective complaints]; see also Johnson v. Barnhart, 434 F.3d at 658 [Accepting ALJ's finding that claimant's activities were inconsistent with complaints of incapacitating pain where she engaged in a variety of activities]; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Based on the record and evidence, the undersigned does not find that the ALJ conducted an improper analysis of Plaintiff's subjective complaints in reaching his conclusions, or



22

that the decision otherwise reflects a failure to properly consider the record and evidence in this case. Bowen, 482 U.S. at 146, n. 5 [Plaintiff has the burden to show that he has a disabling impairment]; see also Guthrie v. Astrue, 2011 WL 7583572, at *3 [Even where substantial evidence may exist to support a contrary conclusion, "[s]o long as substantial evidence exists to support the Commissioner's decision . . . this Court must affirm."]; Kellough v. Heckler, 785 F.2d 1147, 1149 (4th Cir. 1986) ["If the Secretary's dispositive factual findings are supported by substantial evidence, they must be affirmed, even in cases where contrary findings of an ALJ might also be so supported."] (citation omitted)]. This Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence. Smith v. Chater, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]. Therefore, Plaintiff's argument concerning his subjective complaints is without merit.

In sum, while Plaintiff argues that the evidence could support a different finding, the duty to consider the evidence and resolve any conflicts in that evidence rests with the ALJ: not with the Plaintiff, and not with this Court. Hays, 907 F.2d at 1456 [It is the responsibility of the ALJ to weigh the evidence and resolve conflicts in that evidence]; see also Guthrie v. Astrue, No. 10-858, 2011 WL 7583572, at * 3 (S.D.Ohio Nov. 15, 2011), adopted by, 2012 WL 9991555 (S.D.Ohio Mar. 22, 2012). This Court may not overturn a decision that is supported by substantial evidence just because the record may contain conflicting evidence. Smith, 99 F.3d at 638 ["The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court"]; see also Hays, 907 F.2d at 1456 [If there is evidence to justify refusal to direct a verdict were the case before a jury, then there is 'substantial evidence']. While Plaintiff may disagree with the ALJ's RFC finding,

"the determination of a claimant's RFC is ultimately the province of the ALJ as the representative of the Commissioner." McPherson v. Astrue, 605 F. Supp. 2d 744, 755



(S.D.W.Va. 2009) (citing 20 C.F.R. § 404.1527(e)(2)); *see also* <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990)." "The reviewing court's sole responsibility is to determine whether the ALJ's determination of the claimant's RFC is rational and based on substantial evidence." *Id.* (citing <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974)).

<u>Smith-Williams v. Berryhill</u>, No. 16-03556, 2017 WL 1284961, at *9 (S.D.W.Va. Mar. 6, 2017)*,* <u>adopted by</u>, 2017 WL 1281147 (S.D.W.Va. Apr. 4, 2017). The ALJ's decision here is "rational and based on substantial evidence". As such, reversal of the decision by this Court would not be proper. <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-273 (8th Cir. 1988)["The substantial evidence standard presupposes . . . a zone of choice within which the decision makers can go either way without interference by the Courts"].

## Conclusion

Substantial evidence is defined as "... evidence which a reasoning mind would accept as sufficient to support a particular conclusion." <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir.1984). As previously noted, if the record contains substantial evidence to support the decision (i.e., if there is sufficient evidence to justify a refusal to direct a verdict were the case before a jury), this Court is required to uphold the decision, even should the Court disagree with the decision. <u>Blalock</u>, 483 F.2d at 775.

Under this standard, the record contains substantial evidence to support the conclusion of the Commissioner that the Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. Therefore, it is recommended that the decision of the Commissioner be affirmed.



The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

September 11, 2019
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. `Schronce, 727 F.2d 91 (4th Cir. 1984).